UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-21160-Civ-GOLD
         (06-20081-Cr-GOLD)
MAGISTRATE JUDGE P. A. WHITE

RICARDO MAURICIO BERNAL PALACIOS,:

          Movant,                :

v.                               :         REPORT OF MAGISTRATE
                                           JUDGE FOLLOWING
                                           EVIDENTIARY HEARING

UNITED STATES OF AMERICA,        :

          Respondent.            :
_____

Introduction

    This matter is before the Court on the movant's motion to
vacate pursuant to 28 U.S.C. §2255, attacking his conviction and
sentence for conspiring to launder money which was the proceeds of
specified unlawful actions and laundering of monetary instruments
of specified unlawful activity, entered following a guilty plea in
case no. 06-Cr-20081-Gold.

    The Court has reviewed the motion (Cv-DE#1), the government's
answer (Cv-DE#8), the movant's reply (Cv-DE#10), the Pre-sentence
Investigation Report (PSI), and all pertinent portions of the
underlying criminal file.

Claims Raised

    Construing the movant's arguments liberally as afforded pro se
litigants pursuant to Haines v. Kerner, 404 U.S. 419 (1972), the
movant appears to raise the following claims in his §2255 motion:

1

1.  The movant did not knowingly, intelligently or voluntarily plead guilty due to counsel's misrepresentation of the plea agreement. (Cv-DE#1:11).

2.  The movant was denied effective assistance of counsel when his attorney failed to file a motion to withdraw the guilty plea and the plea agreement. (Cv-DE#1:14).

3.  The movant was denied effective assistance of counsel when his attorney failed to file a motion to compel the government to file a motion for downward departure pursuant to U.S.S.G. §5K1.1. (Cv-DE#1:14).

4.  The movant was denied effective assistance of counsel when his attorney failed to file a motion for downward departure based on his cooperation pursuant to U.S.S.G. §5K2. (Cv-DE#1:15).

5.  The movant was denied effective assistance of counsel when his attorney failed to file a motion to enforce the plea agreement and object to the government's breach as the terms of the agreement were written. (Cv-DE#1:16).

6.  The movant is actually innocent in light of the United States Supreme Court decision, <u>United States v. Santos</u>. (Cv-DE#1:17).

7.  The movant was denied effective assistance of counsel when his attorney failed to file a direct appeal

after being requested to do so. (Cv-DE#1:18).

After review of the record, it was determined that evidentiary findings and oral argument were required with respect to **claim seven**, as listed above. The movant was represented by Michael Walsh, Esquire at an evidentiary hearing held on February 9, 2010.

Moreover, to the extent the movant seeks to adopt the claims raised by Co-Defendant Juan Manuel Bernal Palacios (Case No. 09-21212-Cv-Gold), they are hereby incorporated by reference and are denied for the reasons set forth by this Court in the Report and Recommendation in the respective case.

<u>Factual History</u>[1]

From May 2004 to February 2006, the Drug Enforcement Administration conducted an undercover investigation of a large scale money laundering and drug trafficking organization. The organization used a Mexican currency exchange house and U.S. banks to launder drug proceeds from the sale of large quantities of cocaine in Colombia, Mexico and Spain. Ricardo Mauricio Bernal Palacios and his brother, Juan Manuel Bernal Palacios, operated this money laundering and drug trafficking operation originally from Mexico City, Mexico and later from Bogota, Colombia. Camilo Andres Ortiz Echeverri worked for the organization in Colombia, during the entire time of the conspiracy. At sentencing, the Court found that as to Juan Palacios, records revealed he was involved from September 2004 until February 2006.

Around 2002, Ricardo Palacios was originally brought to Mexico

---

[1]The factual history was adduced from the Pre-Sentence Investigation report.

City by another individual to launder drug proceeds for that individual. By 2004, Ricardo Palacios became involved in drug trafficking, brokering large maritime shipments of cocaine that were transported to offshore Mexico. There, the loads would be divided and Mexican drug traffickers would send their cocaine to the United States for sale while the Palacios organization would send its share to Europe, including Spain, for sale there. Ricardo Palacios funneled drug proceeds for himself and others, through the currency exchange house called Ribadeo in Mexico City, which he had access to. He also funneled drug proceeds through the currency exchange house called Catorce. Ricardo Palacios directed and controlled money transfers, laundered drug proceeds for Mexican and Colombian cartels, and laundered funds related to his own sales of large quantities of cocaine in Spain.

In September 2004, Ricardo Palacios' brother, Juan Palacios, approached a confidential source (CS1) in Miami, Florida and asked CS1 to launder proceeds on behalf of the Palacios organization. During the course of the period from 2004 through February 2006, Juan Palacios stayed in frequent contact with the CS1, alerting the CS1 to the wire transfers, discussing rates of exchange, and other day-to-day operational concerns regarding the laundering scheme. Juan Palacios was recorded speaking with the CS1 regarding the money laundering activities on over 60 occasions. Juan Palacios also used email communications on an email account in a nominee name to stay in touch with CS1 and to provide CS1 wire-transfer instructions.

Ortiz was the Palacios organization's representative in Colombia. When the laundered funds arrived in Colombia, Ortiz met with two confidential sources (CS3 and CS4) in Colombia and picked up the money. During each meeting, Ortiz took custody of large

amounts of cash. He was responsible for holding onto the money until he received instructions from Ricardo Palacios, regarding where the money would be transported. The laundered funds were ultimately delivered by Ortiz to Colombian drug traffickers.

In September 2004, CS1 was approached by Juan Palacios on behalf of Ricardo Palacios to launder money through the Black Market Peso Exchange (BMPE) in Miami. During that same time, CS1 met with Ricardo Palacios and Juan Palacios in Mexico City. Ricardo Palacios asked if CS1 could handle the movement of money from the United States to Colombia and CS1 informed Ricardo Palacios that his request could be accommodated. Ricardo Palacios explained he owned Ribadeo in Mexico City and that funds from Ribadeo would be transferred to an account bearing the same name at the Union Bank of California. From that account, Ricardo Palacios would then personally conduct or direct the wire transfer of funds to an account designated by CS1 in Miami, which was in fact a DEA undercover account. Thereafter, it was the responsibility of CS1 to repatriate the funds from the United States to Ortiz, in Bogota. For this service, Ricardo Palacios agreed to pay CS1 a commission of three percent of the value of the funds transferred. Ricardo Palacios also told CS1 that if CS1 was successful with the wired funds, there was approximately €7,000,000, which were drug funds located in Spain that also needed to be repatriated back to either Colombia or Mexico.

Upon CS1's return to Miami, Juan Palacios began to conduct or directed the wire transfer of funds to the Miami bank account designated by CS1. Upon receipt, CS1 routed the funds to identified currency traffickers in the greater South Florida area. These suspected currency traffickers then requested that CS1 obtain cashier's checks in the name of various computer or auto part

exporters in the Greater Miami metropolitan area. It is believed that merchandise such as computer hardware and auto parts were then purchased and shipped to Bogota. In Bogota, the merchandise was sold on the black market, realizing currency in the form of Colombian pesos. This method of laundering money, referred to as the BMPE, allowed for the transfer of drug proceeds to Colombia without U.S. dollars ever leaving the United States. The cycle of laundering drug proceeds was complete when the Colombian pesos are delivered to Colombian drug traffickers.

In the instant offense, after the cashier's checks were delivered to the exporters in the Miami metropolitan area, the exporters' corresponding counterparts in Colombia delivered the value of the cashier's check to CS3 and CS4 in Bogota. These sources then delivered the Colombian pesos to Ortiz, who in turn delivered the funds to the Colombian drug traffickers. Through this process, the Palacios organization completed the production, importation and sale of cocaine as well as the laundering and reinvestment of drug proceeds.

From October 15, 2004 through May 2, 2005, the Palacios organization was responsible for wire transfers totaling $1,524,605.30 from the Ribadeo bank account in California to the DEA undercover bank account in Florida. There were 30 wire transfers ranging in amounts from $12,106 to $85,115.10 during that time period. Those funds, less the pre-agreed commission, were funneled through the BMPE, for eventual delivery to Ortiz in Bogota. Ortiz then delivered the funds in the form of Colombian pesos to the Colombian drug traffickers or otherwise used the funds at Ricardo Palacios' direction.

In May 2005, Ricardo and Juan Palacios began to conduct or

directed the wire transfer of funds from the Catorce bank account in Curacao to the same DEA undercover bank account in Florida. From May 20, 2005 through September 28, 2005, the Palacios organization was responsible for wire transfers totaling $992,521.73 from the Cartoce bank account to the DEA undercover bank account in Miami. There were 17 wire transfers ranging in amounts from $15,688 to $89,500.23 during that time period. These funds, less the pre-agreed upon commission, were also funneled through the BMPE, for eventual delivery to Ortiz in Bogota. In turn, Ortiz delivered the funds to the Colombian drug traffickers or otherwise used the funds as directed by Ricardo Palacios.

In January 2005, following the successful transfer of the first 19 transactions by CS1 to Bogota, Ricardo Palacios requested that CS1 travel to Madrid, Spain, to pick up €1,000,000. On February 21, 2005, CS1, along with a DEA undercover agent (UCA), traveled to Spain to accommodate Ricardo Palacios' request.

In early 2005, Ricardo Palacios was also in contact with another confidential source in Mexico (CS2). Ricardo Palacios had previously explained to CS2 that he and others were smuggling large multi-hundred kilograms loads of cocaine to Spain for sale in Europe. Ricardo Palacios requested that CS2 travel to Spain and act as his representative for the purpose of assisting him with the collection of drug proceeds and the transportation of those proceeds back from Spain to Mexico or Colombia. Once CS2 arrived in Spain, CS2 was placed in contact with other members of the Palacios organization, including Jose Bahamon-Ramirez, an unindicted co-conspirator.

On March 1, 2005, after establishing contact with CS2 in Spain, CS1 and DEA UCA traveled to Barcelona, Spain, where CS1 and

the DEA UCA picked up €399,060 from Bahamon. The following day, Ricardo Palacios' contact directed CS1 to another location in Madrid, to pick up another €300,000. However, after several attempts, the pick up of €300,000 never materialized. On March 4, 2006, €399,060 was transported by the DEA UCA back to the United States.

On March 9, 2005, €399,060 was converted into approximately $511,993 and deposited into the DEA undercover account. It is noted that the $511,993 was included in the 47 transactions discussed above. Installments of these funds were later wire transferred to other co-conspirators or drug traffickers, per Ricardo and Juan Palacios' instruction or funneled through the BMPE for eventual delivery to Ortiz in Bogota.

Following the €399,060 picked up in Spain, Spanish customs authorities detained the occupants and searched the contents of a Gulfstream IV jet, chartered from California to Barcelona, in Barcelona. Inside the jet, Spanish law enforcement officers discovered and seized €5,500,000. One of the passengers, a Mexican national residing legally in Los Angeles, California, was allowed to return to the United States via Monterrey, Mexico. The DEA's investigation later revealed that €5,500,000 belonged to the Palacios organization.

Subsequent to the delivery of €399,060 in Barcelona, Spain law enforcement began to conduct surveillance on Bahamon and other members of a money laundering cell operating in Spain. Further surveillance of those members led Spanish law enforcement officers to a warehouse identified as Maritima Istmo, S.L. Information from Spanish customs indicated that shipments of merchandise listed as "dock bumpers" had been sent to the Maritima warehouse on as many

as 50 prior occasions with another shipment due on March 22, 2005. On March 22, 2005, a search of the warehouse by Spanish law enforcement resulted in the seizure of approximately 2,000 kilograms of cocaine, €7,400,000 in cash and the arrest of eight persons, including Bahamon, all of whom were part of the money laundering/drug trafficking operation.

In April 2005, CS1 met with Ricardo and Juan Palacios in Mexico City. During that meeting, CS1 inquired about returning to Spain to conduct another pickup of Eurodollar currency; however, Ricardo Palacios stated that CS1 could not return to Spain at that time. Ricardo Palacios explained that just after CS1 returned with €399,060, approximately €5,000,000 belonging to him was seized by Spanish law enforcement officers from a jet in Barcelona. Ricardo Palacios also told CS1 that he believed the pilot was a U.S. law enforcement informant. Ricardo Palacios told CS1 that a few weeks later, the Spanish police raided the warehouse and seized the equivalent of €65,000,000. The €65,000,000 included the €7,400,000 seized by Spanish law enforcement, and the remainder was the equivalent of proceeds expected to be generated from the sale of approximately 2,000 kilograms of cocaine in the European market.

Another unindicted co-conspirator involved in the money-laundering scheme was Anton Perez, who was an officer for Ribedeo. Perez was murdered in 2005. There were also at least two unindicted co-conspirators residing in Spain during the time of the conspiracy, who wire-transferred drug proceeds at Ricardo Palacios' direction from bank accounts in Spain to bank accounts in Mexico and the United States and/or who smuggled drug proceeds from Spain to Mexico City. These funds were realized from the sale of cocaine in Spain belonging to the Palacios organization. CS2 met with one of these individuals during the time of the Euro pickup in March

9

2005 and learned from this information from him.

In September 2005, during a meeting between CS1 and Ricardo and Juan Palacios, CS1 was told by Ricardo Palacios that recently several of the "fast boats" containing drugs were intercepted by Mexican law enforcement authorities. According to CS1, Ricardo and Juan Palacios, fearing reprisal and possible abduction by the Mexican Federal Police, abruptly left Mexico City. Ricardo and Juan Palacios subsequently returned to their native Colombia where their illegal trafficking activities in concert with Ortiz continued until they were arrested on March 2, 2006. Juan Palacios and Ortiz were both aware that the source of the funds was from narcotics trafficking.

The funds that were laundered throughout the instant offense were derived from narcotics trafficking proceeds. Ricardo Palacios laundered funds that were derived from Mexican cartels and also his foreign cocaine distribution. A total of $1,517,127.03 was laundered by the Palacios organization during the instant offense. Although €12,900,000 of Palacios organization money was seized by Spanish law enforcement, which is the equivalent of about $17,028,000, the government cannot prove those funds were laundered.

## Procedural History

The procedural history of the underlying criminal case reveals on February 7, 2006, the grand jury returned an indictment charging the movant with conspiracy to launder monetary instruments, in violation of 18 U.S.C. §1956(h) (Count 1); laundering of monetary instruments of specified unlawful activity, in violation of 18 U.S.C. §1956(a)(1)(A)(i) (Counts 2-31); and laundering of monetary

instruments of specified unlawful activity, in violation of 18 U.S.C. §1956 (a)(2)(A) (Counts 32-48). (Cr-DE#3).

On August 28, 2007, the movant, by way of a plea agreement, pleaded guilty to Counts 1, 2-31, 32-47 and 48. (Cr-DEs#85,86).

A PSI was prepared in anticipation of sentencing wherein the probation officer determined that the movant's base offense level was 26 pursuant to U.S.S.G. §2B1.1(b)(1)(J). (PSI¶36). Moreover, because the defendant knew or believed that the laundered funds were the proceeds of, or were intended to promote an offense involving the manufacture, importation or distribution of a controlled substance or listed chemical, his base offense was increased by six levels. (PSI¶37). Because the defendant was in the business of laundering funds, the offense level was increased by four levels. (PSI¶38). Likewise, because the movant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive, the offense level was increased by four levels. (PSI¶40). However, because the movant clearly demonstrated acceptance of responsibility for his offense, his base offense level was decreased by three levels. (PSI¶¶44,45). The movant's total base offense level was set at 37. (PSI¶46).

The probation officer further determined the movant had zero criminal history points and a criminal history category of I. (PSI¶49). Based on a total offense level of 37 and a criminal history category of I, the movant's guideline range was 210 to 262 months.

On May 22, 2008, the movant was sentenced to 210 months imprisonment, followed by two years of supervised release and an assessment of $4,800. (Cr-DE#154). Count 49 was dismissed. (Id.).

The Clerk entered judgment on May 28, 2008. (Cr-DE#161). The judgment of conviction became final at the latest on June 11, 2008, ten days after the entry of judgment, when time expired for filing a notice of appeal.[2] This motion to vacate was timely filed less than one year later.

Waiver of Claims

Before turning to a discussion of the claims on the merits, it should first be noted that the movant waived his right to contest all nonjurisdictional defects and defenses, when he entered into a knowing and voluntary guilty plea. It appears the movant contends the sentence he received, along with counsel's failure to file a direct appeal with respect thereto. It is well-settled that sentence appeal waivers are valid if made knowingly and voluntarily. Williams v. United States, 396 F.3d 1340, 1341 (internal citation omitted). The Eleventh Circuit has held that "[a] valid sentence-appeal waiver, entered into voluntarily and knowingly, pursuant to a plea agreement, precludes the defendant from attempting to attack, in a collateral proceeding, the sentence through a claim of ineffective assistance of counsel during sentencing." Williams v. United States, 396 F.3d 1340, 1341 (11th Cir. 2005); see also, Leach v. United States, 171 Fed. Appx. 765 (11th Cir. 2006); Johnson v. United States, 2007 WL 4615236 *5-6 (S.D. Fla. 2007).

---

[2]Where, as here, a defendant does not pursue a direct appeal, the conviction becomes final when the time for filing a direct appeal expires. Adams v. United States, 173 F.3d 1339, 1342 n.2 (11th Cir. 1999). The time for filing a direct appeal expires ten days after the judgment or order being appealed is entered. Fed.R.App.P. 4(b)(1)(A)(I). The judgment is "entered" when it is entered on the docket by the Clerk of Court. Fed. R. App. P. 4(b)(6). On December 1, 2002, Fed.R.App.P. 26; which contains the rules on computing and extending time, was amended so that intermediate weekends and holidays are excluded from the time computation for all pleadings due in less than 11 days.

In this case, the movant's waiver of his right to collateral attack is valid and enforceable. The record demonstrates that this Court specifically questioned movant about the waiver and he understood its significance. (Cv-DE#8,Ex.G:29). In particular, the Court reviewed the three conditions in which the movant would be able to appeal his sentence. (<u>Id.</u>). The Court also warned the movant that if none of the conditions occur, then the movant's right to appeal the sentence imposed was waived. (<u>Id.</u>). Therefore, the waiver of his right to collaterally attack his sentence is enforceable, and the Court need not reach the merits of the movant's arguments relating to his sentence as found in his claims. <u>Williams v. United States</u>, 396 F.3d 1340, 1341. As noted by the <u>Williams</u> court, to hold otherwise would permit the movant "to circumvent the terms of the sentence-appeal waiver simply by recasting a challenge to his sentence as a claim of ineffective assistance, thus rendering the waiver meaningless." <u>Williams</u>, <u>supra</u>. Notwithstanding, the claims will be addressed briefly on the merits below.

Moreover, to ensure that a plea is voluntary and knowing, Fed.R.Cr.P. 11(b)(1) states that "the court must address the defendant personally in open court before accepting the plea and inform the defendant of, and determine that the defendant understands . . . the nature of each charge to which the defendant is pleading." <u>Gordon v. United States</u>, 496 F.3d 1270, 1277 (11th Cir. 2007). The rule imposes upon a district court the obligation and responsibility to conduct a searching inquiry into the voluntariness of a defendant's guilty plea. <u>Id.</u> (citations omitted).

Thus, "[a] court accepting a guilty plea must comply with Rule

11 and specifically address three 'core principles,' ensuring that a defendant (1) enters his guilty plea free from coercion, (2) understands the nature of the charges, and (3) understands the consequences of his plea." <u>United States v. Moriarty</u>, 429 F.3d 1012, 1019 (2005). In <u>Moriarty</u>, the Eleventh Circuit specifically held as follows:

> [t]o ensure compliance with the third core concern, Rule 11(b)(1) provides a list of rights and other relevant matters about which the court is required to inform the defendant prior to accepting a guilty plea, including: the right to plead not guilty (or persist in such a plea) and to be represented by counsel; the possibility of forfeiture; the court's authority to order restitution and its obligation to apply the Guidelines; and the Government's right, in a prosecution for perjury, to use against the defendant any statement that he gives under oath.

<u>Id.</u>

Review of the change of plea proceedings reveals that the court conducted a thorough Rule 11 proceeding. (Cv-DE#8,Ex.G). At that time, the movant acknowledged under oath[3] that he was satisfied with counsel's representation, and that he had discussed all things necessary and the indictment was translated for him from English to Spanish for his understanding. (<u>Id.</u>:8,10). The court advised and the movant acknowledged the potential consequences of entering a guilty plea. (<u>Id.</u>:26-29). The movant denied that anyone

---

[3]The law is clear that "solemn declarations in open court carry a strong presumption of verity," forming a "formidable barrier in any subsequent collateral proceedings." <u>Blackledge v. Allison</u>, 431 U.S. 63, 73-74 (1977); <u>United States v. Rogers</u>, 848 F.2d 166, 168 (11th Cir. 1988). The subsequent presentation of conclusory allegations, unsupported by specifics, is subject to summary dismissal, as are contentions which in the face of the record are wholly incredible.  <u>Machibroda v. United States</u>, 368 U.S. 487 (1962).

has made any promise or guarantee as to what his actual sentence would be from the Court. (Id.:28). The movant also denied being forced, threatened or coerced into changing his plea. (Id.:30). Moreover, the movant acknowledged that his signature appeared on the written plea agreement and it was signed by his own free will. (Id.). The court further advised the movant of the essential elements of the offenses, as well as, how the sentencing guidelines could potentially affect the outcome of his sentence. (Id.:16-23,27-29). Likewise, the Court advised the movant of all the rights he waived as a result of pleading guilty, which included the right to plead not guilty, to have a trial by jury, to see and hear all the witnesses and have them cross-examined, to take the witness stand and testify, to have subpoenas issued to compel witnesses to testify in court and if he was convicted he had the full right to appeal all legal rulings, as well as his conviction, without any restrictions as contained in his plea agreement. (Id.:30-31).

On the record before this court, it is evident that the movant understood the facts and the elements of the offense upon which the charges rested. Moreover, by way of entering into the negotiated plea agreement, the movant was telling his lawyer not to conduct any further investigation and not present at a trial proceeding any legal defenses that he may be entitled to as it relates to his case. Under these circumstances, no showing has been made that the plea was anything but knowing and voluntary. Therefore, the movant's knowing and voluntary guilty plea waived all non-jurisdiction defects and defenses. Thus, he is not entitled to review of his claims, as listed above in this collateral proceeding. Notwithstanding, the claim will be addressed briefly on the merits below.

To the extent the movant means to argue that he was unaware of

the consequences of his plea, that claim is also belied by the record. As noted above, the Rule 11 proceeding addressed the consequences of the guilty plea and the sentence appeal waiver. Thus, it is clear that the movant may not collaterally challenge his sentence, as he purports to do so here, in the guise of an ineffective assistance of counsel claim.

There is nothing of record to suggest that the movant did not understand the significance of the waiver of appeal. The record reveals that the waiver did not result in an unlawful denial of his right to appeal, but was rather a part of a lawful, enforceable agreement between the movant and the government. Under the circumstances presented here, the movant is not only precluded from challenging the manner in which his sentence was imposed, but is also precluded from challenging his sentence in the guise of an ineffective assistance of counsel claim. <u>Williams</u>, <u>supra</u>. Thus, the movant has failed to establish prejudice pursuant to <u>Strickland</u> and is therefore entitled to no relief on these claims.  This will be discussed in detail, <u>infra</u>.

### <u>Evidentiary Hearing</u>

In his motion, the movant argues counsel failed to file a direct appeal after being requested to do so. (Cv-DE#1:18). At the February 9, 2010 evidentiary hearing, testimony was taken from the movant, his criminal defense attorney, Martin Roth, Esquire and paralegal investigator, Isaac Rodriguez.

*The Law: Direct Appeal and the Duty to Consult:*

Counsel's failure to file a direct appeal after being <u>requested</u> to do so by his client results in a <u>per se</u> constitutional

16

violation of the movant's Sixth Amendment right to counsel, which entitles the movant to an appellate proceeding. Roe v. Flores-Ortega, 528 U.S. 470 (2000) ("we have long held that a lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable").

There is a presumption of prejudice "with no further showing from the defendant of the merits of his underlying claims when the violation of the right to counsel rendered the proceeding presumptively unreliable or entirely nonexistent." Roe v. Flores-Ortega, supra at 484. A defendant need not establish that his direct appeal would have been arguably meritorious; he need only show that his counsel's constitutionally deficient performance deprived him of an appeal he would have otherwise taken--i.e., the defendant expressed to his attorney a desire to appeal. Id.; see also, McElroy v. United States, 2007 WL 4393955, *1 (11th Cir. 2007); Gomez-Diaz v. United States, 433 F.3d 788, 792 (11th Cir. 2005).

Even if the defendant contractually waived the right to appeal, counsel may be ineffective for not filing a notice of appeal when directed to by the defendant because the merits of an appeal are not to be considered when determining whether an out-of-time appeal should be permitted. Gaston v. United States, 237 Fed.Appx. 495, 497 (11th Cir. 2007). Likewise, the defendant need not show that there were viable grounds for such an appeal. Martin v. United States, 81 F.3d 1083 (11th Cir. 1996); Montemoino v. United States, 68 F.3d 416, 417 (11th Cir. 1995); Restrepo v. Kelly, 178 F.3d 634, 641-42 (2d Cir. 1999)(holding that a habeas petitioner alleging ineffective assistance of counsel based on counsel's failure to file a requested notice of appeal need not

17

demonstrate that his defaulted appeal would have succeeded in order to establish prejudice sufficient for habeas relief).

The law is also clear that appellate counsel must both perfect an appeal and file a brief to perform effectively as an advocate. Cannon v. Berry, 727 F.2d 1020 (11th Cir. 1984); Mylar v. Alabama, 671 F.2d 1299 (11th Cir.), rehearing denied en banc, 677 F.2d 117 (1982); Perez v. Wainwright, 640 F.2d 596 (5th Cir. 1981). The failure to do so constitutes ineffective assistance, per se, so that habeas corpus relief in such cases does not depend on a showing of actual prejudice. Cannon v. Berry, supra. In the case of an appeal following a guilty plea, however, the defendant is entitled to an out-of-time appeal of sentencing issues only. Id. Only sentencing claims may be raised on an appeal-out-of-time following a plea because "the few grounds upon which the guilty plea may be challenged are not limited to direct appellate review, but instead are more appropriately raised in §2255 proceedings." Montemoino at 417.

However, if the movant is silent on whether he wished to file an appeal or not, a Strickland[4] analysis must be undertaken, Roe v. Flores-Ortega, supra, and it must first be determined whether counsel actually consulted with the defendant about an appeal. If so, counsel is only ineffective if he failed to file an appeal after being requested to do so. If counsel has not consulted with the defendant about the advantages and disadvantages of prosecuting a direct appeal, then a second question must be asked: whether counsel's failure to so consult constitutes deficient performance. Id. Counsel's performance is deemed deficient when "there is reason

---

[4]Strickland v. Washington, 466 U.S. 668 (1984). To prevail on a claim of ineffective assistance, a movant must demonstrate that his attorney's efforts fell below constitutional standards, and that he suffered prejudice as a result.

to think either (1) that a rational defendant would want to appeal (for example when there are nonfrivolous grounds for appeal) or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." Id. The Court noted that a "highly relevant factor in this inquiry will be whether the conviction follows a trial or a guilty plea[5]," but cautioned that all relevant factors must be examined, and expected that in the "vast majority of the cases," courts will find "that counsel had a duty to consult with the defendant about an appeal." Id.

*Testimony: The movant*

The movant was arrested and extradited to the United states from Colombia, where he stayed at the Federal Detention Center in Miami, on charges of money laundering. Initially, he was represented by Humberto Dominguez.

Eventually, the movant pleaded guilty pursuant to a written plea agreement. Although he acknowledged that his initials appeared at the bottom of every page and the last page contained his signature, he nevertheless testified that the contents therein were never read to him. Rather, because the movant neither reads or writes English, he relied upon his attorney's explanation of the plea agreement.

When questioned regarding the waiver of his appellate rights, the movant testified that it was his understanding, in accordance with his plea agreement, that he waived his right to appeal a sentence so long as it did not exceed 87 months. Moreover, he was

---

[5] The court noted that a guilty plea reduces the scope of potentially appealable issues and may indicate that the defendant seeks an end to judicial proceedings.

never made aware that his appellate rights were subject to three conditions.

During the change of plea hearing, when Judge Gold asked the movant whether the plea agreement had been translated from English to Spanish, he indicated yes based on the explanation his attorney provided. Subsequent to entering a guilty plea, the movant fired Attorney Dominguez and in his place, hired Martin Roth, Esquire. Mr. Roth was not involved in any way with advising or counseling the movant with respect to the plea agreement. However, Mr. Roth commented that the plea agreement was a very bad decision.

The movant was ultimately sentenced to 210 months imprisonment. At which time, he immediately directed to counsel to file an appeal. Despite the movant's request, counsel indicated to him that an appeal could not be filed because the movant had signed the agreement waiving his appellate rights. Notwithstanding counsel's advice, the movant insisted on filing an appeal. Moreover, on two or three additional occasions following the sentencing hearing, the movant again directed counsel to file an appeal. He believed, that despite the appellate waiver contained in the plea agreement, he maintained his right to appeal; a belief based upon the District Court Judge's statement that if he was unhappy with his sentence, an appeal could be filed.

*Testimony: Counsel*

Attorney Martin Roth, a seasoned criminal defense lawyer, testified that he was asked to represent the movant as the case went forward in terms of preparing for sentencing. According to Mr. Roth, the movant never told him that he had been promised 87 months imprisonment. Rather, the movant informed counsel that he initiated

20

cooperation, which the movant believed was moving forward in a successful manner. Moreover, counsel and the movant discussed the possibility of moving to withdraw the plea agreement, however, after discussing the matter, they concluded that in all likelihood, they would be unsuccessful in doing so since it was counsel's belief that adequate grounds did not exist.

Subsequent to the court pronouncing the sentence, counsel visited the movant, wherein the possibility of both, filing an appeal and cooperation, were discussed. It was then decided that the movant would meet with Isaac Rodriguez, counsel's paralegal, to discuss any information which could lead to significant cooperation. It was counsel's intention, despite whether the government no longer wanted to cooperate, to provide the information to the DEA's database in the hopes of changing the government's mind. It was counsel's position that an appeal would not accomplish anything, but instead harden the lines from the government's office regarding any potential cooperation in the future. Attorney Roth thereafter sent a letter to the government informing that the movant would not appeal his sentence and that he and the movant were still of the mind that the movant wanted to pursue cooperation.

*Testimony: Paralegal Investigator*

Isaac Rodriguez, a paralegal investigator, testified that he assists Mr. Roth by conducting interviews and review of court files in preparation for trial. Mr. Rodriguez assisted Mr. Roth in translating for the movant. The movant never indicated that he did not understand the conversations between he and Mr. Rodriguez. The two spoke frequently either by phone or in person and they met about 20 to 30 times.

According to Mr. Rodriguez, he and the movant discussed their concerns regarding the appellate waiver. Eventually, the movant chose to cooperate instead of pursuing an appeal because the movant had information he thought was very valuable.

Moreover, Mr. Rodriguez spoke to the movant about seven to nine times after the period for filing an appeal expired. Never, during any of the foregoing meetings did the movant direct Mr. Rodriguez to file an appeal.

*Analysis:*

In this case it is disputed whether counsel failed to file a direct appeal after being requested to do so.

Having carefully attended to the testimony at the evidentiary hearing, the witnesses' demeanor and the record as a whole, the undersigned credits the testimony of movant's counsel, Attorney Roth, that the movant never directed counsel to file an appeal or indicated he wanted to pursue a direct appeal. The court is not persuaded and finds disingenuous the movant's testimony that despite never inquiring as to the status of his direct appeal, he insisted that counsel file a direct appeal.

Even if it is found that the movant was silent on whether he wished to file an appeal, counsel did not have an absolute duty to consult with the movant concerning the advantages and disadvantages of an appeal. As discussed above, if the record is inconclusive as to whether the defendant requested an appeal and counsel thereafter did not consult with the defendant, counsel's performance is deficient when there is reason to think either (1)that a rational defendant would have wanted to appeal or (2) that this particular

defendant reasonably demonstrated to counsel that he was interested
in appealing. It is evident from the record that a reasonable
defendant in the movant's situation would not have wanted to
appeal, as he received a sentence at the low end of the guidelines.
Moreover, it is axiomatic that the movant did not reasonably
demonstrate to counsel that he was interested in appealing. Under
these circumstances, counsel was not ineffective for failing to
file an appeal. It was evident that the movant did not want to go
forward with a notice of appeal. Thus, the movant has failed to
establish deficient performance or prejudice pursuant to <u>Strickland
v. Washington</u>, 466 U.S. 668 (1984).

<u>Remaining Claims</u>

As will be demonstrated in more detail <u>infra</u>, the movant is
not entitled to vacatur on any of the claims presented.[6] When
viewing the evidence in this case in its entirety, the alleged
errors raised in this collateral proceeding, neither individually
nor cumulatively, infused the proceedings with unfairness as to
deny the petitioner a fundamentally fair trial and due process of
law. The movant therefore is not entitled to habeas corpus relief.
<u>See</u> <u>Fuller v. Roe</u>, 182 F.3d 699, 704 (9th Cir. 1999)(holding in
federal habeas corpus proceeding that where there is no single
constitutional error existing, nothing can accumulate to the level
of a constitutional violation), <u>overruled on other grounds</u>, <u>Slack</u>

---

[6]Briefly, the evidence against the movant was more than sufficient to
support his conviction. The movant has not shown that the result of the trial,
appeal, or sentencing would have been affected had counsel proceeded
differently. In other words, no deficient performance or prejudice pursuant to
<u>Strickland</u> has been established arising from any of the claims raised in this
collateral proceedings, nor has a denial of due process been demonstrated. To
the contrary, it is clear after independent review of the record that the
movant received a fair trial, and that no constitutional violations occurred.
Consequently, he has failed to demonstrate that he is entitled to habeas
corpus relief in this collateral proceeding.

v. McDaniel, 529 U.S. 473, 482 (2000). See also United States v. Rivera, 900 F.2d 1462, 1470 (10th Cir. 1990)(stating that "a cumulative-error analysis aggregates only actual errors to determine their cumulative effect."). Contrary to the movant's apparent assertions, the result of the proceedings were not fundamentally unfair or unreliable. See Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993).

Ineffective assistance of counsel claims are subject to the two-part test enunciated in Strickland v. Washington, 466 U.S. 668 (1994), which is not a favorable standard to the movant. See Massaro v. United States, 538 U.S. 500, 505 (2003). To prevail on a claim of ineffective assistance, a movant must demonstrate both that (1) counsel's performance was deficient, meaning that it fell below an objective standard of reasonableness; and (2) the deficient performance prejudiced the defendant. Chandler v. United States, 218 F.3d 1305, 1312-13 (11th Cir. 2000)(en banc), cert. denied, 531 U.S. 1204 (2001). ; Strickland v. Washington, 466 U.S. 668 (1984). Moreover, a habeas court's review of a claim under the Strickland standard is "doubly deferential." Knowles v. Mirzayance, ____ U.S. ____, 129 S.Ct. 1411, 1418, 173 L.Ed.2d 251 (2009). In deciding whether counsel's performance was deficient, judicial scrutiny is "highly deferential" and requires us to "'indulge [the] strong presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment.'" Id. at 1314 (quoting Strickland v. Washington, 466 U.S. at 689-90.

When assessing a lawyer's performance, "[C]ourts must indulge the strong presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment." Chandler v. United States, 218

F.3d 1305 (11th Cir. 2000)(en banc), <u>cert</u>. <u>denied</u>, 531 U.S. 1204 (2001). The court's role in reviewing ineffective assistance of counsel claims is not to "grade a lawyer's performance; instead, [the court] determine[s] only whether a lawyer's performance was within "the wide range of professionally competent assistance." <u>Van Poyck v. Florida Dept. of Corrections</u>, 290 F.3d 1318, 1322 (11th Cir.), <u>cert</u>. <u>denied</u>, 537 U.S. 812 (2002), <u>quoting</u>, <u>Strickland v. Washington</u>, 466 U.S. 668, 690. Review of counsel's conduct is to be highly deferential. <u>Spaziano v. Singletary</u>, 36 F.3d 1028, 1039 (11th Cir. 1994), and second-guessing of an attorney's performance is not permitted. <u>White v. Singletary</u>, 972 F.2d 1218, 1220 (11th Cir. 1992)("Courts should at the start presume effectiveness and should always avoid second-guessing with the benefit of hindsight."); <u>Atkins v. Singletary</u>, 965 F.2d 952, 958 (11th Cir. 1992). A claim of ineffective assistance is a mixed question of law and fact. <u>Strickland</u>, 466 U.S. at 698.

The Eleventh Circuit will not "second-guess counsel's strategy." <u>Chandler</u>, 218 F.3d at 1314, n.14. Strategic choices, even those "made after less than complete investigation," are evaluated for their reasonableness and "counsel's reliance on particular lines of defense to the exclusion of others--whether or not he investigated those other defenses--is a matter of strategy and is not ineffective unless the petitioner can prove the chosen course, in itself, was unreasonable." <u>Chandler</u>, 218 F.3d at 1318 (<u>quoting</u> <u>Strickland</u>, 466 U.S. at 690-91).

The courts "are not interested in grading lawyers' performances;" but rather, "are interested in whether the adversarial process at trial . . . worked adequately." <u>Rogers v. Zant</u>, 13 F.3d 384, 386 (11th Cir. 1994)(quotation marks omitted). To be unreasonable, the performance must be such that "no competent

counsel would have taken the action that [the petitioner's] counsel did take." Grayson v. Thompson, 257 F.3d 1194, 1216 (11th Cir. 2001)(emphasis omitted). In other words, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." Rogers v. Zant, 13 F.3d at 386.

Under the second prong of the test set forth in Strickland, the movant can be said to have been prejudiced by counsel's performance only if there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Rather, the movant must demonstrate that "there is a reasonable probability that, absent [counsel's] errors, the jury would have had a reasonable doubt regarding [his] guilt." Blackburn v. Foltz, 828 F.2d 1177, 1186 (6th Circ. 1987), cert. den'd, 485 U.S. 970 (1988), see also, Montgomery v. Petersen, 846 F.2d 407, 416 (7th Cir. 1988).

In the context of a case in which guilty pleas or the equivalent were entered, application of the second prong of the two-pronged Strickland standard requires a showing that there is a reasonable probability that but for counsel's errors, the defendant would not have pleaded guilty and would have insisted on going to trial. Hill v. Lockhart, 474 U.S. 52 (1985). The movant, in this collateral proceeding, does claim that but for counsel's alleged deficient performance, he would not have pleaded guilty and would have proceeded to trial. Notwithstanding, his claims are bereft of record support.

Moreover, it is well settled that tactical or strategic choices by counsel cannot support a collateral claim of ineffective assistance. United States v. Costa, 691 F.2d 1358 (11th Cir. 1982); Coco v. United States, 569 F.2d 367 (5th Cir. 1978). Even if such a decision in retrospect appears incorrect, it can constitute ineffective assistance only "if it was so patently unreasonable that no attorney would have chosen it," Adams v. Wainwright, 709 F.2d 1443, 1445 (11th Cir.), cert. denied, 464 U.S. 1663 (1984), or if the petitioner can demonstrate a "reasonable probability that the verdict [otherwise] would have been different." Kimmelman v. Morrison, 477 U.S. 365, 375 (1986).

Decisions whether to call a particular witness or cross-examine certain witnesses are generally questions of trial strategy. See United States v. Costa, 691 F.2d 1358 (11th Cir. 1982). However, where counsel failed to investigate and interview promising witnesses, and therefore "ha[s] no reason to believe they would not be valuable in securing [defendant's] release," counsel's inaction constitutes negligence, not trial strategy. Workman v. Tate, 957 F.2d 1339, 1345 (6th Cir. 1992)(quoting United States ex rel. Cosey v. Wolff, 727 F.2d 656, 658 n.3 (7th Cir. 1984)). Nevertheless, strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable. Strickland v. Washington, 466 U.S. at 690-91.

Moreover, it should be noted that the movant's remaining claims could have been, but were not raised on direct appeal. However, a claim of ineffective assistance of counsel may constitute cause for failure to previously raise the issue. United States v. Breckenridge, 93 F.3d 132 (4th Cir. 1996). Attorney error, however, does not constitute cause for a procedural default unless it rises to the level of ineffective assistance of counsel

under the test enunciated in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984); <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986). Thus, the claims will be identified and treated in this Report, <u>infra</u>.

In **claim one**, the movant asserts he did not knowingly, intelligently or voluntarily plead guilty due to counsel's misrepresentation of the plea agreement. (Cv-DE#1:11).

As previously discussed <u>supra</u>, the movant entered into a voluntary and knowing guilty plea. As such, the movant cannot now argue that his plea was involuntarily and unknowingly entered into due to counsel's misrepresentations.

In **claim two**, the movant asserts counsel rendered ineffective assistance for failing to file a motion to withdraw the guilty plea and the plea agreement. (Cv-DE#1:14). Specifically, the movant argues that his second attorney, Mr. Roth, was aware of the circumstances surrounding his first attorney's, Mr. Humberto Dominguez's, representation of the terms of the plea agreement. (<u>Id.</u>). Thus, Mr. Roth was ineffective for failing to file a motion to withdraw the plea because Mr. Dominguez misrepresented that he would still face enhancements despite the plea. (Cv-DE#13).

In order for a movant to prevail on the merits of a claim asserting a misrepresentation by his attorney in explaining the consequences of a plea agreement, he must prove: (1) his attorney provided misinformation; (2) his attorney's performance fell below an objective standard of reasonableness; and (3) had it not been for the misrepresentation, he would not have pleaded guilty and would have insisted on proceeding to trial. <u>Yordan v. Dugger</u>, 909 F.2d 474, 479 (11th Cir. 1990); <u>citing</u> <u>Holmes v. United States</u>, 876 F.2d 1545 (11th Cir. 1989). A strong presumption that counsel's conduct fell within the wide range of professional assistance

28

exists when making an inquiry under this test. Id. at 477; citing Harich v. Dugger, 844 F.2d 1464, 1469 (11th Cir. 1988).

In Yordan, the Eleventh Circuit reversed the denial of a habeas petition and remanded it for evidentiary hearing when a letter was presented showing that the defendant's attorney provided misinformation concerning the possible penalty. Id. at 478. Specifically, counsel stated that if the defendant pleaded guilty to count one of the information, he would be eligible for parole within five to seven years. Id. at 478. Second, the defendant emphatically alleged that he would not have pleaded guilty to count one had he known about the mandatory 25-year sentence for the offense. Id. Finally, the district court failed to apply the two-part tested delineated in Hill, supra. Id. Thus, the Eleventh Circuit concluded to remand the case for further consideration. Id.

However, in Oullete, the First Circuit denied the movant's request to vacate his guilty plea where the movant failed to refute the extensive record; the movant's support for his claim was bare; any misstatement by counsel was cured by the court; and despite the numerous opportunities to apprise the court of the issue, the movant failed to do so until his §2255 motion was filed. Oullette v. United States, 862 F.2d 371, 375 (1st Cir. 1988).

In this collateral proceeding, as will be recalled, the movant alleges his attorney misrepresented the enhancements he faced. However, during the change of plea hearing, the government asserted that prior to the hearing, both the movant and his attorney were informed of the government's intention to seek several enhancements at sentencing, including an enhancement for the movant's leadership role in the organization. (Cv-DE#8,Ex.G:49-50). Moreover, as in Oullete, the movant, aside from simply stating that counsel

29

misrepresented the terms of the plea agreement, he has failed to refute the record and has provided scant support for his claim. Accordingly, the movant's allegation with respect to Mr. Dominguez is without merit and therefore, Mr. Roth was not ineffective for failing to file a motion to withdraw his guilty plea and plea agreement.

Moreover, no showing has been made that even if counsel had moved to withdraw the movant's guilty plea and plea agreement, the Court would have granted said motion. Thus, the movant cannot prevail on this claim, as no prejudice has been established arising from counsel's failure to pursue this claim.

In **claim three**, the movant asserts counsel rendered ineffective assistance for failing to file a motion to compel the government to file a motion for downward departure pursuant to U.S.S.G. §5K1.1. (Cv-DE#1:14).

Section 5K1.1 of the Federal Sentencing Guidelines provides:

Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines.

(a) The appropriate reduction shall be determined by the court for reasons stated that may include, but are not limited to, consideration of the following:

(1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;

(2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;

> (3)  the nature and extent of the defendant's assistance;
>
> (4)  any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;
>
> (5)  the timeliness of the defendant's assistance.

U.S.S.G. §5K1.1.

Pursuant to Section 5K1.1 of the guidelines, the government's decision to file a motion for downward departure for substantial assistance is discretionary. Therefore, the government has the power, but not the duty to file said motion. United States v. Forney, 9 F.3d 1492, 1500-01 (11th Cir. 1993). Accordingly, a district court is not in a position to grant a motion for downward departure for substantial assistance absent a motion by the government. Wade v. United States, 504 U.S. 181, 185 (1992).

In this collateral proceeding, the movant fails to provide any support that the government was obligated to file a motion for reduction of sentence or that the government refused to file the substantial assistance motion because of a constitutionally impermissible motivation such as race or religion.[7] See Forney, 9 F.3d 1502. No constitutional motive was alleged in this case.

Moreover, the government never promised to file a motion for reduction of sentence by way of express terms of a written or oral

---

[7] The district court does not evaluate the assistance rendered by a defendant offering cooperation as a term of his plea agreement unless and until the government files a 5K1.1 motion. Forney, 9 F.3d 1502; citing Wade v. United States, 504 U.S. 181 at 1843-44 (1992). Thus, courts are precluded from intruding into the prosecution's discretion. Id. However, "judicial review is appropriate when there is an allegation and a substantial showing that the prosecution refused to file a substantial assistance motion because of a constitutionally impermissible motivation, such as race or religion. Id.

31

plea or any other agreement. In fact, the plea agreement specifically reads:

> This Office reserves the right to evaluate the nature and extent of the defendant's cooperation and to make the defendant's cooperation, or lack thereof, known to the court at the time of sentencing. If in the sole and unreviewable judgment of this Office the defendant's cooperation is of such quality and significance to the investigation or prosecution of other criminal matters as to warrant the court's downward departure from the sentence required by the Sentencing Guidelines, this Office may at or before sentencing make a motion pursuant to Section 5K1.1 of the Sentencing Guidelines, 18 U.S.C. §3553(e), or a Rule 35 motion subsequent to sentencing, reflecting that the defendant has provided substantial assistance and recommending sentence reduction. The defendant acknowledges and agrees, however, that nothing in this Agreement may be construed to require this Office to file such a motion and that this Office's assessment of the nature, value, truthfulness, completeness, and accuracy of the defendant's cooperation shall be binding on the defendant.

(Cr-DE#85,¶10). Accordingly, it was well within the government's discretion to assess any assistance provided by the movant and whether the assistance was substantial enough to warrant a downward departure pursuant to U.S.S.G. §5K1.1. Therefore, counsel was not ineffective for failing to file a motion to compel the government to file a motion for downward departure.

In **claim four**, the movant asserts he was denied effective assistance of counsel when his attorney failed to file a motion for downward departure based on his cooperation pursuant to U.S.S.G. §5K2.0. (Cv-DE#1:15). This claim is also without merit.

Generally, U.S.S.G. §5K2.0 permits a court to depart from the sentencing guidelines if there exists "an aggravating or mitigating circumstance, of a kind, or to a degree, not adequately taken into

consideration by the Sentencing Commission in formulating the guidelines . . . ." U.S.S.G. §5K2.0. The movant fails to raise a kind of aggravating or mitigating circumstance that was not "adequately taken into consideration by the Sentencing Commission." The only reason for a downward departure pursuant to §5K2.0 the movant raises is cooperation, which is already a factor the Sentencing Commission took into consideration when formulating the guidelines and therefore this remedy is unavailable.

Section 5K1.1 of the Sentencing Guidelines specifically addresses the rewarding of defendants who provide substantial assistance to the government. Moreover, the Eleventh Circuit has rejected a similar argument posited by the movant. In United States v. Duffy, the Court rejected the argument that 5K2.0 authorized departures for substantial assistance. See United States v. Duffy, 179 F.3d 1304, 1305 n.1 (11th Cir. 1999).

Contrary to the movant's arguments, counsel filed a motion for downward departure pursuant to U.S.S.G. §5K2.0 based on the movant's harsh and difficult conditions of incarceration suffered while at Combita Prison in Colombia. (Cr-DE#118). Under these circumstances, the movant cannot establish prejudice pursuant to Strickland arising from counsel's failure to raise the claim stated herein.

In **claim five**, the movant asserts counsel failed to file a motion to enforce the plea agreement and object to the government's breach as the terms of the agreement were written. (Cv-DE#1:16).

The plea agreement in part reads:

The defendant is aware that the sentence will be imposed

by the court after considering the Federal Sentencing Guidelines and Policy Statements (hereinafter "Sentencing Guidelines"). The defendant acknowledges and understands that the court will compute an advisory sentence under the Sentencing Guidelines and that the applicable guidelines will be determined by the court relying in part on the results of a Pre-Sentence Investigation by the court's probation office, which investigation will commence after the guilty plea has been entered. The defendant is also aware that, under certain circumstances, the court may depart from the advisory sentencing guideline range that it has computed, and may raise or lower that advisory sentence under the Sentencing Guidelines. The defendant is further aware and understands that the court is required to consider the advisory guideline range determined under the Sentencing Guidelines, but is not bound to impose that sentence; the court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines' advisory sentence. Knowing these facts, the defendant understands and acknowledges that the court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offense(s) identified in paragraph 1 and that the defendant may not withdraw the plea solely as a result of the sentence imposed.

The defendant also understands and acknowledges that as to Counts 1-48, the Court may impose a maximum term of imprisonment of twenty years, to be followed by a term of supervised release of up to three years, and a maximum fine of $500,000 or twice the value of the property involved in the transactions, whichever is greater. The defendant understands that the Court may order that any sentence ordered under one count may be ordered to be served consecutively or concurrently with any other sentence ordered under another court.

* * * * *

The United States and the defendant agree to make the following sentencing recommendations to the Court at the time of sentencing:

a.    <u>Base Offense Level</u>: As to Counts 1-48, the United States and the defendant agree that the quantity of laundered funds exceeded $2.5 million, resulting in a

34

base offense level of 26, pursuant to U.S.S.G. §2S1.1(a)(2); and

b. <u>U.S.S.G. §2S1.1(b)(1)</u>: As to Counts 1-48, the United States and the defendant agree that the defendant knew or believed that the laundered funds were the proceeds of, or were intended to promote, an offense involving the manufacture, importation, or distribution of a controlled substance or a listed chemical. Accordingly, the 6-level enhancement set forth in this subsection applies.

(Cr-DE#85).

According to the PSI, the movant received a base offense level of 26 and a six-level enhancement because he knew or believed that the laundered funds were the proceeds of, or were intended to promote an offense involving the manufacture, importation or distribution of a controlled substance. (PSI¶¶36,37). However, it appears the movant takes issue with two additional enhancements he received; to wit: a four-level enhancement because he was in the business of laundering funds and a four-level enhancement because he was an organizer or leader of criminal activity that involved five or more participants. (PSI¶¶38,40). As a result of the two additional enhancements, his base offense level totaled 40. (PSI¶42). However, he was given a three-level reduction for acceptance of responsibility, thus resulting in a base offense level of 37. (PSI¶¶44-47). According to the movant, the government breached the terms of the plea agreement when he received the latter two enhancements because said enhancements were not set forth in the plea agreement. (Cv-DE#1:16). Specifically, he argues that because the plea agreement stated that the government would only recommend a base offense level of 26 and a 6-level enhancement because he knew or believed that the laundered funds were the proceeds of, or were intended to promote an offense involving the manufacture, importation or distribution of a controlled substance, he was led to believe that the government would not make any other

35

recommendations.

Notwithstanding the movant's contentions, he has failed to establish that the government breached any of the terms of the plea agreement. No where in the plea agreement did the government state that it would not seek enhancements in order to induce the movant to plead guilty. In fact, the government complied with the terms of the plea agreement. The movant, after the government's recommendation, received a base offense level of 26, along with a 6-level enhancements for laundering drug proceeds. Moreover, the government moved to have Count 49 dismissed. Likewise, the government recommended the movant receive the three-level reduction for acceptance of responsibility. Moreover, during the sentencing hearing, the movant was well aware that the government continued to seek enhancements and the government was not precluded from doing so pursuant to the express terms of the plea agreement. Under these circumstances, the movant cannot establish prejudice pursuant to Strickland arising from counsel's failure to raise the foregoing claim.

In **claim six**, the movant is actually innocent in light of United States v. Santos. (Cv-DE#1:17).

In Santos, the Supreme Court construed an ambiguity in the federal money-laundering statutes in favor of the defendants and overturned their convictions. United States v. Santos, __ U.S. __, 128 S.Ct. 2020 (2008). At issue was whether the term "proceeds" as employed throughout the statute meant "receipts" or "profits." See id. at 2024. Because the defendants had been convicted for transactions involving the receipts of illegal activity that were not the profits of that activity, the definition of the term was central to the validity of their convictions. Writing for the

majority, Justice Scalia noted that profits and receipts were both accepted synonyms for proceeds, and that the rule of lenity required the resolution of this ambiguity in favor of the defendants. <u>See</u> <u>id.</u> at 2025.

It is well established law in the Eleventh Circuit that it is not ineffective assistance for an attorney to fail to foresee a change in the law. <u>See</u>, <u>United States v. Ardley</u>, 273 F.3d 991 (11th Cir.2001)(denial of suggestion for rehearing en banc)(our circuit law completely forecloses the contention that an attorney's failure to anticipate the <u>Apprendi</u> decision is ineffective assistance); <u>Spaziano v. Singletary</u>, 36 F.3d 1028, 1039 (11th Cir.1994) ("We have held many times that '[r]easonably effective representation cannot and does not include a requirement to make arguments based on predictions of how the law may develop.'"). Counsel was not ineffective for failing to foresee the development in the law as <u>Santos</u> was unsettled case law at the time his judgment was final. Under these circumstances, the movant cannot establish prejudice pursuant to <u>Strickland</u> arising from counsel's failure to raise a <u>Santos</u> claim.

Moreover, in a recent case, the Eleventh Circuit held that the <u>Santos</u> holding has "limited precedential value" and refused to extend the holding to a money laundering case in which the proceeds came from drug trafficking. <u>United States v. Demarest</u>, 570 F3d 1232, 2009 WL 1606937, *8 (11th Cir. June 10, 2009). "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'" The narrow holding in <u>Santos</u>, at most, was that the gross receipts of an unlicensed gambling operation were not "proceeds" under section

1956, but there is no evidence that the funds Demarest laundered were gross receipts of an illegal gambling operation. The evidence instead established that the laundered funds were the proceeds of an enterprise engaged in illegal drug trafficking. Id. (quoting Marks v. United States, 430 U.S. 188, 193 (1977)).

Moreover, to the extent the movant argues he is actually innocent, this claim is without merit. A habeas petitioner attempting to establish "actual innocence" must meet a high standard. Bousley v. United States, 523 U.S. 614 (1998). The movant must demonstrate that "in light of all the evidence, 'it is more likely than not that no reasonable juror would have convicted him.'" Bousley, supra at 623, quoting, Schlup v. Delo, 513 U.S. 298, 327-328 (1995). The Court emphasized that actual innocence means factual innocence, not mere legal insufficiency. Id. See also High v. Head, 209 F.3d 1257 (11th Cir. 2000); Lee v. Kemna, 213 F.3d 1037, 1039 (8th Cir.2000); Lucidore v. New York State Div. of Parole, 209 F.3d 107 (2nd Cir. 2000); citing Schlup v. Delo, 513 U.S. 298, 299, (1995); Jones v. United States, 153 F.3d 1305 (11th Cir. 1998)(holding that appellant must establish that in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him). To be credible, a claim of actual innocence requires the petitioner to "support his allegations of constitutional error with new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial." Schlup v. Delo, 513 U.S. at 324. All things considered, the evidence must undermine the Court's confidence in the outcome of the trial. Id. at 316. The movant fails to provide any facts to support his claim of actual innocence. Thus, no such showing of actual innocence has been made here.

Under these circumstances, the movant cannot establish prejudice pursuant to Strickland, supra and is entitled to no relief from this claim.

<u>Conclusion</u>

It is therefore recommended that the motion to vacate be denied.

Objections to this report may be filed with the District Judge within fourteen days of receipt of a copy of the report.

Dated this 18th day of February, 2010.

_____

UNITED STATES MAGISTRATE JUDGE

cc:  Michael D. Walsh, Esq.
     46 NE 6th Street
     Miami, FL 33132
     Phone: 305-444-7700
     Fax: 305-441-1423

     Anne Ruth Schltz, AUSA
     United States Attorney's Office
     99 NE 4 Street
     Miami, FL 33132
     Phone: 305-961-9117
     Fax: 305-530-7941

     Anthony W. Lacosta, AUSA
     United States Attorney's Office
     99 N.E. Fourth Street
     Suite 800
     Miami, FL 33121
     Phone: 305-961-9280
     Fax: 305-536-4676

39